1  WO

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                       FOR THE DISTRICT OF ARIZONA

8

9   Mark Blodgett, a single man; Starboard )    CIV-10-2233-PHX-MHB
    Financial Management, LLC, an Arizona )
10  limited liability company,            )      **ORDER**
                                          )
11              Plaintiffs,               )
                                          )
12  vs.                                   )
                                          )
13  Shelter Mortgage Company, LLC, a      )
    Wisconsin limited liability company; and )
14  Guaranty Bank, a Milwaukee, Wisconsin )
    family owned bank,                    )
15                                        )
                Defendants.               )
16  _____)

17          Pending before the Court is Plaintiff Mark Blodgett's ("Blodgett") Motion for Partial

18  Summary Judgment (Doc. 100) and Defendant Shelter Mortgage Company, LLC ("Shelter"),

19  and Guaranty Bank, F.S.B.'s ("Guaranty"), (collectively, "Defendants") Motion for

20  Summary Judgment on Plaintiffs' Claims (Doc. 104).  After considering the arguments raised

21  by the parties in their briefing, the Court now issues the following ruling.

22          On August 24, 2010, Plaintiffs Blodgett and Starboard Financial Management, LLC

23  ("Starboard"), (collectively, "Plaintiffs") filed a Complaint against Defendants in the

24  Superior Court of the State of Arizona alleging breach of contract claims relating to a Loan

25  Origination Agreement between the parties.  The Complaint also alleged that Guaranty

26  misappropriated Blodgett's name and identity without consent or permission to obtain an

27  insurable interest in his life.  Defendants subsequently removed the action to this Court on

28

October 20, 2010, and thereafter filed their Answer and Counterclaim alleging, *inter alia*, breach of the agreements between the parties, breach of good faith and fair dealing, conversion, and a claim for breach of fiduciary duty against Plaintiffs.

On August 5, 2011, Plaintiffs filed a First Amended Complaint adding seven new causes of action (in addition to the previous claims) all predicated on Blodgett's original claim that Guaranty allegedly misappropriated his name and identity to obtain a life insurance policy on him without consent or permission. Thus, in all, in addition to the breach of contract claims, Plaintiffs assert multiple counts relating to Guaranty's alleged deception in obtaining insurance benefits payable to itself in excess of the "free" benefit offered to Blodgett. Specifically, Count Two of the Amended Complaint alleges that Guaranty misappropriated Blodgett's name and identity to obtain the life insurance benefit. Count Four alleges that Guaranty unlawfully converted the right to control the life insurance policy and its proceeds by obtaining it without Blodgett's consent or knowledge. Counts Five and Six allege that Guaranty's actions with respect to the policy constitute fraud or, at a minimum, negligent misrepresentation. Counts Seven and Eight allege that Guaranty's purchase of the life insurance policy and benefit without Blodgett's knowledge or consent violates Arizona and Wisconsin statutes.[1] And, Counts Nine and Ten allege that Guaranty was unjustly enriched and that Blodgett should have a constructive trust over the policy.

After an additional nine months of discovery, Blodgett and Defendants filed their dispositive motions on May 30 and 31, 2012, respectively. The parties filed their responses to each other's motions on August 20, 2012, and filed their replies on September 19, 2012.

## FACTUAL BACKGROUND[2]

---

[1] Blodgett concedes that because the Preferred Death Benefit Agreement (explained later in the Background section of this Order) states that it is governed by Wisconsin law, Defendants are entitled to summary judgment on Blodgett's claim for violation of A.R.S. § 20-1107 (Count Seven). Thus, the Court will grant Defendants' Motion for Summary Judgment as to Count Seven.

[2] The following facts are derived from the First Amended Complaint; documents in this Court's record; and the exhibits and attachments supplied with Blodgett's Statement of

1  Guaranty, a Milwaukee-based bank, hired Blodgett in 1995 to start up the Arizona

2  Branch of Shelter – Guaranty's wholly owned subsidiary.  Blodgett served as a branch

3  manager and vice president for Shelter.  Blodgett reported to Jill Belconis, President of

4  Shelter, as well as members of Guaranty's executive committee, including Gerald Levy.

5  **A.   Facts Relevant to Blodgett's Bank-Owned Life Insurance Claims**

6  On December 3, 1999, Guaranty offered an opportunity to certain qualified, full-time

7  vice presidents and above to participate in a preferred death benefit plan.  Blodgett was

8  amongst the select employees to whom Guaranty extended this offer.  According to

9  Defendants, the preferred death benefit was a piece of Guaranty's broader bank-owned life

10  insurance ("BOLI") policies.

11  Defendants state that the premium for the BOLI policies was paid entirely up front by

12  Guaranty; Guaranty owns the BOLI policies; and Guaranty's ownership of the policies was

13  set forth in its disclosures to the applicable employees.  As indicated, as part of the BOLI

14  policies, Guaranty provided a death benefit to select employees.  Guaranty was also a

15  beneficiary of the BOLI policies it purchased on the select employees' lives.

16  Blodgett, as a qualified employee, received materials sent by Guaranty related to its

17  BOLI policies.  The cover letter accompanying the materials stated that Guaranty was

18  offering a preferred death benefit to certain qualified, full-time vice presidents, and that the

19  benefit was being provided to Blodgett at no cost to him.

20  In order to receive the preferred death benefit, the cover letter instructed Blodgett to

21  return the information enclosed in the packet of materials to Marty Matsoff of Northwestern

22  Mutual Life "within the next 7 days."  The letter stated that, "[i]f forms are not returned

23  timely, this benefit will not be available to you." If Blodgett had any questions regarding the

24  _____

25  Facts, Defendants' Statement of Facts, Plaintiffs' Controverting Statement of Facts, and
Defendants' Response to Blodgett's Statement of Facts.  Defendants have also filed a

26  pleading entitled Defendants' Reply to Plaintiffs' Controverting Statement of Facts in
Support of Plaintiffs' Response to Defendants' Motion for Summary Judgment.  The Court

27  finds that this pleading is unauthorized by the Local Rules and, accordingly, will not consider

28  it.  The Court will deny Plaintiffs' Motion to Strike Reply Statement of Facts (Doc. 134) as
moot.

packet of materials, the cover letter instructed him to contact Sally Andrist in Guaranty's Human Resources Department or Michelle Rossi at Northwestern Mutual Life.

In addition to the cover letter, Blodgett's packet of materials included, *inter alia*, a personal information form and the Preferred Death Benefit Agreement.  The Agreement stated that Guaranty "shall at all times be the owner of the policy" and "shall have the right to designate the beneficiary thereunder," and set forth that Guaranty was purchasing a life insurance policy on Blodgett's life.  The Agreement further provided that Guaranty, at its option, had the right to cancel the BOLI policy, increase coverage, decrease coverage, or take any other action with respect to the BOLI policy.  The Agreement stated that the preferred death benefit would terminate on the date that Blodgett's employment with Shelter was terminated – unless such termination is by reason of death.

As to the amount of the death benefit, the Agreement indicated that "Preferred Death Benefit Amount" shall be distributed to the "Executive's designated beneficiaries," and provided,

> in the event of Executive's death during the term of this Agreement, the Corporation hereby agrees to provide to the Executive, in addition to any other deferred or other compensation made available to the Executive from time to time by the Corporation, a Preferred Death Benefit in the aggregate amount of up to three times the Average Annual Compensation [with a maximum benefit of $500,000].

Blodgett completed and signed the required documents including the Preferred Death Benefit Agreement and the Employer Sponsored Underwriting Questionnaire, which stated in pertinent part: "The Insured consents to this application for life insurance in accordance with the terms of the employer's Life Insurance Program ... ."  On the personal information form, Blodgett checked off the box marked "no" to the question, "[a]s a result of this purchase will the values or benefits of any other life insurance policy or annuity contract, on any life, be affected in any way?"  Blodgett then mailed the documents to Marty Matsoff at his Northwestern Mutual Life office located in Mequon, Wisconsin.

Upon receipt of the signed documents from Blodgett, Matsoff completed the paperwork required by Northwestern Mutual Life, submitted all of the materials to the home office in Wisconsin, and gave the beneficiary designation form to Guaranty.  Northwestern

- 4 -

Mutual Life then issued a policy of life insurance on Blodgett, which was delivered to Guaranty in Wisconsin.  The BOLI policy states that the owner of the policy is "Guaranty Bank FSB, Employer of the Insured" and that the owner of the policy may exercise policy rights without the consent of any beneficiary.

Blodgett did not receive a copy of the BOLI policy that was issued.  Guaranty made no affirmative decision to copy the BOLI policies and distribute them to the employees whom they had insurance on.

Blodgett terminated his employment with Shelter effective September 30, 2010. Accordingly, as of September 30, 2010, Blodgett's rights to any death benefit under the Preferred Death Benefit Agreement terminated.

**B.      Facts Relevant to Plaintiffs' Breach of Contract Claims**

On March 31, 2005, Blodgett and Shelter entered into a Compensation Agreement. The Compensation Agreement provided that Blodgett "shall receive a base salary of $75,000/year for his services as Manager of Employer's Arizona retail mortgage lending operations ... (the 'Arizona Branch')."  The Agreement stated that "Employer and a licensed mortgage broker or lender entity owned and controlled by Blodgett ('Originator') shall also enter the Loan Origination Agreement ... . Except for any provisions which expressly survive the termination thereof, the Origination Agreement shall continue to remain in effect so long as Blodgett remains an employee of Employer."  Pursuant to the Compensation Agreement, it was also agreed that "Blodgett and the Arizona Branch shall be subject to all of Employer's policies and procedures, including, without limitation, all human resources, accounting, compliance and data security policies."

On that same date, Blodgett and Shelter entered into a Loan Origination Agreement as referred to in the Compensation Agreement.  The record indicates that Blodgett formed Starboard in November of 2005, which ultimately became the "Originator" under the Origination Agreement.

The Origination Agreement provided as follows: "1. Originator agrees to work exclusively with [Shelter] to originate mortgage loans.  Originator agrees and acknowledges

that any loan submitted shall be subject to the policies and procedures of [Shelter] as exist on the date of submission," and "2. Originator shall receive fifty percent (50%) of the 'Net Profits' of [Shelter's] Arizona retail mortgage lending operations."  Further, pursuant to paragraph six of the Origination Agreement, in order to ensure that Shelter "is not left to bear all Loan Losses ... should Originator ever terminate this Agreement with [Shelter] for any reason; Originator agrees that it shall be responsible to pay [Shelter] fifty percent (50%) of any Loan Losses ... attributable loans generated by the Arizona Branch while this Agreement is in effect.  This obligation shall extend for a period of 3 years after termination of this Agreement.  Originator shall secure this obligation with [Shelter] by pledging an account worth at least $250,000."

Sometime after the parties entered into the Compensation and Origination Agreements, the record indicates that Guaranty's financial situation worsened as a result of the "Great Recession."  And, in March of 2009, the Office of Thrift Supervision of the Department of Treasury issued a cease-and-desist order against Guaranty stating, *inter alia*, the "Association and its directors, officers, and employees shall cease-and-desist from any unsafe and unsound practices addressed in the OTS Report of Examination dated July 7, 2008 of the Association (ROE), that precipitated the diminished capital levels, poor earnings, high level of classified assets, and inadequate policies and procedures."  According to Guaranty, the cease-and-desist order extended to all Shelter branches, and mandated that Guaranty stop home equity lending and obtain approval for anything that fell outside the normal course of business.

Despite Guaranty's overall financial misfortunes, Shelter's Arizona Branch remained profitable.  The record states that the Arizona Branch never experienced a quarterly loss up to Blodgett's departure in September of 2010.  Specifically, in addition to Blodgett's $75,000 salary, the record reflects that Blodgett/Starboard received $792,534.91 in 2005; $1,100,875.58 in 2006; $823,489.19 in 2007; $1,116,483.87 in 2008; and $1,404,408.04 in 2009.  In 2010, Starboard reported a gross profit of $1,716,307.00, of which $1,062,796.91 came from Guaranty.

1  Beginning in 2009, across the country including Arizona, as part of an overall strategy
2  to decrease risk, Guaranty began cutting back on, or stopping altogether, construction loans
3  and land loans.  Guaranty also cut back on jumbo lending.  As a result, Blodgett approached
4  Guaranty about modifying the Loan Origination Agreement.  The Origination Agreement
5  was subsequently modified to remove the exclusivity provision, allowing Blodgett and
6  Starboard to originate construction loans with funding from other entities as long as Blodgett
7  and Starboard agreed to follow certain parameters.  According to the record, under this
8  modified arrangement, for loans originated by Starboard after February 10, 2009, Starboard
9  would receive all of the fees, interest and income, and did not have to share any of the profits
10 with Shelter or Guaranty.  Despite this modification, however, Blodgett was not able to
11 replace the level of funding that Guaranty had previously provided.  In a letter dated
12 September 2, 2010, Blodgett informed Guaranty that his last day of employment would be
13 September 30, 2010.  Blodgett's last day at Guaranty was September 17, 2010.

**STANDARD OF REVIEW**

15 Summary judgment is warranted if the evidence shows there is no genuine issue as
16 to any material fact and the moving party is entitled to judgment as a matter of law.  See
17 Fed.R.Civ.P. 56(a).  The moving party must produce sufficient evidence to persuade the
18 court that there is no genuine issue of material fact.  See Nissan Fire & Marine Ins. Co., Ltd.
19 v. Fritz Cos., Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).  Conversely, to defeat a motion for
20 summary judgment, the nonmoving party must show that there are genuine issues of material
21 fact.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  A material fact is one
22 that might affect the outcome of the suit under the governing law, and a factual issue is
23 genuine "if the evidence is such that a reasonable jury could return a verdict for the
24 nonmoving party."  Id. at 248.

25 The moving party bears the initial burden of identifying those portions of the
26 pleadings, depositions, answers to interrogatories, and admissions on file, together with the
27 affidavits, if any, which it believes demonstrate the absence of any genuine issue of material
28 fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the nonmoving party would

1   bear the burden of persuasion at trial, the moving party may carry its initial burden of

2   production under Rule 56(a) by producing "evidence negating an essential element of the

3   nonmoving party's case," or by showing, "after suitable discovery," that the "nonmoving

4   party does not have enough evidence of an essential element of its claim or defense to carry

5   its ultimate burden of persuasion at trial." Nissan Fire, 210 F.3d at 1105-06; High Tech Gays

6   v. Defense Indus. Sec. Clearance Office, 895 F.2d 563, 574 (9th Cir. 1990).

7          When the moving party has carried its burden under Rule 56(a), the nonmoving party

8   must produce evidence to support its claim or defense by more than simply showing "there

9   is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith

10  Radio Corp., 475 U.S. 574, 586 (1986). Where the record, taken as a whole, could not lead

11  a rational trier of fact to find for the nonmoving party, there is no genuine issue of material

12  fact for trial. See id. The nonmoving party's evidence is presumed to be true and all

13  inferences from the evidence are drawn in the light most favorable to the nonmoving party.

14  See Eisenberg v. Ins. Co. of North America, 815 F.2d 1285, 1289 (9th Cir. 1987). If the

15  nonmoving party produces direct evidence of a genuine issue of material fact, the motion for

16  summary judgment is denied. See id.

17                                    **DISCUSSION**

18         Blodgett moves this Court for summary judgment on the BOLI claims – Counts Two,

19  Four, Five, Six, Eight, Nine, and Ten of the First Amended Complaint. Blodgett contends

20  that each of these claims is based on the same undisputed facts that – Guaranty induced

21  Blodgett to provide his confidential medical information by promising him a "preferred death

22  benefit" of up to $500,000, and then used Blodgett's name and information to obtain a $1.2

23  million insurance policy on his life. Blodgett did not know the face value of the life

24  insurance policy Guaranty obtained on his life. Guaranty withheld this information from

25  Blodgett because it did not think Blodgett was entitled to know. Guaranty benefitted from

26  using Blodgett's name and personal information without his knowledge and consent.

27

28

1   Blodgett claims that he is entitled to restitution as either the current cash value of the BOLI

2   policy or a constructive trust on the policy.[3]

3          Defendants move for summary judgment on all of Plaintiffs' claims set forth in the

4   First Amended Complaint.  Regarding Blodgett's BOLI claims, Defendants argue that they

5   are entitled to summary judgment based upon undisputed facts establishing that Guaranty

6   owns the BOLI policy, Blodgett knew of and consented to the BOLI policy, Guaranty had

7   no duty to disclose more information to Blodgett, and Blodgett did not suffer any damages.

8   As to Plaintiffs' breach of contract claims, Defendants state that they did not breach the

9   Compensation Agreement or the Loan Origination Agreement.

10  **A.      Blodgett's BOLI Claims**

11         **1.      Violation of Wis. Stat. § 631.07 (Count Eight)**

12         Blodgett argues that there can be no reasonable factual dispute that Guaranty violated

13  Wis. Stat. § 631.07.  Specifically, Blodgett states that Guaranty invited Blodgett to accept

14  a life insurance benefit equal to three times his salary for as long as he was employed.  The

15  Preferred Death Benefit Agreement sent to Blodgett, he complains, did not disclose the face

16  amount of the policy that Guaranty planned to obtain, and contained an attachment explicitly

17  stating that the face amount of the policy would be three times his salary capped at $500,000.

18         Once Guaranty had Blodgett's confidential medical information, Blodgett contends

19  that Guaranty attached its own application for life insurance in the amount of $1,200,000 to

20  Northwestern Mutual Life.  Guaranty's application was never shown or given to Blodgett,

21  and it was certainly not signed by him.  When the policy was issued, it was never provided

22  _____

23         [3]  The Court notes that much of Blodgett's Motion is spent discussing Guaranty's
    alleged "outrageous" and "repugnant" conduct related to obtaining the BOLI policy without
24  Blodgett's consent.  Blodgett, however, fails to identify or address the requisite elements of
    his tort claims, and provides no discussion or analysis related to his claims for
25  Misappropriation of Name and Identity (Count Two) or Negligent Misrepresentation (Count
    Six).  In his Reply, Blodgett recites the elements of his claims under his choice-of-law
26  section and also states that in light of the fact that both Plaintiffs' and Defendants' motions
    for summary judgment address the BOLI claims, the briefing on the two motions should be
27  analyzed together.  Blodgett provides significantly more discussion on the elements of his
    tort claims in Plaintiffs' Response to Defendants' Motion for Summary Judgment.
28

1    to Blodgett.  Thus, since Guaranty withheld from Blodgett the "terms of the insurance

2    contract" on his life, and specifically the amount of the policy, Blodgett could not have given

3    his consent to the "policy," as required by Wisconsin statute.

4          Defendants argue that Blodgett consented to the application for insurance and, in any

5    event, Guaranty is not an insurer as defined by the statute, and as such, could not have

6    violated Wis. Stat. § 631.07(2).

7          Wisconsin statute § 631.07 provides, in pertinent part:

8          (1)  Insurable interest. No insurer may knowingly issue a policy to a person
           without an insurable interest in the subject of the insurance.
9
           (2) Consent in life and disability insurance. Except under sub. (3), no insurer
10         may knowingly issue an individual life or disability insurance policy to a
           person other than the one whose life or health is at risk unless the latter has
11         given written consent to the issuance of the policy. Consent may be expressed
           by knowingly signing the application for the insurance with knowledge of the
12         nature of the document, or in any other reasonable way.

13         The parties do not dispute that Guaranty had an insurable interest on Blodgett's life.[4]

14   Indeed, it is generally recognized that a corporation has an insurable interest in the lives of

15   its key officers, and has the power to obtain such insurance.  See 56 A.L.R.3d 1086 (cases

16   cited therein).  This is often referred to as "key man" life insurance, and it is predicated upon

17   the concept that the corporation derives a pecuniary benefit or advantage from the continued

18   life of the insured, or that the corporation will suffer pecuniary loss upon the death of the

19   insured.  As branch manager and vice president of Shelter, Guaranty's wholly owned

20   subsidiary, Guaranty had an insurable interest on Blodgett's life.[5]

21

22         [4] Although Blodgett's Motion for Partial Summary Judgment initially argued that

23   Guaranty "lacks and insurable interest in [Blodgett's] life," the crux of Blodgett's argument
     is that Guaranty failed to obtain his written consent to the policy – and therefore Guaranty
24   has no insurable interest on Blodgett's life.

25         [5] The statute at issue provides that "[n]o insurer may knowingly issue a policy to a

26   person without an insurable interest in the subject of the insurance."  And, the Court agrees
     that Guaranty had an insurable interest on Blodgett's life when the subject policy was issued.
27   The Court notes, however, that nothing in the Wisconsin statute (or other statutory or
     contractual provision provided to the Court) addresses who may be insured or named as
28   beneficiary or to the effect that the insurance shall terminate if the beneficiary shall, after

As to whether Blodgett had given his written consent to the issuance of the policy, among the BOLI documents presumably read and signed by Blodgett were the Preferred Death Benefit Agreement and Underwriting Questionnaire. The Underwriting Questionnaire specifically states: "The insured consents to this application for life insurance in accordance with the terms of the employer's Life Insurance Program ... ."

Despite his signatures, Blodgett argues that, "[u]nder Wisconsin law, an insured must give written consent to the 'policy'" and claims that pursuant to Wis. Stat. § 600.03(35), the "definition of a 'policy' is 'any document other than a group certificate used to prescribe in writing the terms of an insurance contract, including endorsements and riders and service contracts issued by motor clubs.'" Blodgett states that "[i]t is undisputed that Guaranty withheld from Blodgett the 'terms of the insurance contract' on his life [], and specifically the amount of the policy." Thus, Blodgett asserts that he could not have given his consent to the "policy," as required by law. The Court is not persuaded and finds that Blodgett expressed his consent to the issuance of the policy.

The statute at issue provides that an insured must give "written consent to the issuance of the policy," which "may be expressed by knowingly signing the application for the insurance with knowledge of the nature of the document, or in any other reasonable way." By signing the Underwriting Questionnaire provided by Northwestern Mutual Life, Blodgett consented to the "application for life insurance in accordance with the terms of the employer's Life Insurance Program." Under Guaranty's Life Insurance Program, as specifically set forth in the Preferred Death Benefit Agreement (which Blodgett also signed and agreed to), Guaranty owned the BOLI policy, and Guaranty had the right to designate the beneficiary thereunder, including itself. The completed documents were forwarded to Northwestern Mutual Life, who undoubtedly believing that it had complied with Wis. Stat.

issuance of the policy, cease to have an insurable interest in the life of the insured.

§ 631.07 by obtaining Blodgett's written consent, then issued a policy of life insurance on Blodgett.[6]

Moreover, by its plain language, Wis. Stat. § 631.07 prohibits insurers from issuing life insurance policies without written consent to the issuance of the policy. The definition of an "insurer" is set forth in Wis. Stat. § 600.03(27), which provides:

> "Insurer" means any person or association of persons doing an insurance business as a principal, and includes, but is not limited to, fraternals, issuers of gift annuities, cooperative associations organized under s. 185.981, insurers operating under subch. I of Ch. 616 and risk retention groups. It also includes any person purporting or intending to do an insurance business as a principal on his or her own account.

Guaranty is not an insurer, and Guaranty did not issue the BOLI policy on Blodgett's life – it was issued by Northwestern Mutual Life.

The Court finds that Guaranty did not violate Wis. Stat. § 631.07, and will grant Defendants' Motion for Summary Judgment and deny Blodgett's Motion for Partial Summary Judgment as to Count Eight.

### 2.   Unjust Enrichment (Count Nine)[7]

---

[6] Blodgett submits his own after-the-fact, self-serving affidavit stating: "If the Bank had told me that the Bank was to be the primary beneficiary on the policy and that, upon my departure from the Bank, the Bank would be the only beneficiary, I would not have consented. The idea that the Bank would benefit from my death is repugnant to me and would have been sufficient by itself for me to decline the offer." Blodgett states further: "When I learned that upon my death the Bank is going to receive a death benefit in excess of $1,800,000, that fact caused me a great deal of emotional distress. It was shocking. I felt duped. I felt defrauded. I feel extremely uncomfortable with the idea that someone that is not a family member, someone that I did not willingly, knowingly designate to be a beneficiary of my death would be benefiting without my consent. It continues to trouble me on a daily basis." While such self-serving statements can be sufficient to create a genuine issue of material fact in that credibility determinations are not those of a judge when ruling on a motion for summary judgment, here, Blodgett's statements are not dispositive on the issue. Blodgett's after-the-fact statements are directly contradicted by his presumed understanding and consent of the issuance of the BOLI policy as demonstrated by his signing the Preferred Death Benefit Agreement and the Underwriting Questionnaire.

[7] In light of the fact that Wisconsin has the most significant relationship to the questions at issue in Blodgett's BOLI claims and in consideration of the choice-of-law provision contained in the Preferred Death Benefit Agreement, the Court will analyze this

1        In his Reply to his Motion for Partial Summary Judgment, Blodgett argues that he

2   conferred a benefit on Guaranty by providing his personal and medical information, which

3   Guaranty knew it would use to obtain a valuable insurance policy on his life without his

4   consent in violation of Wisconsin statutes.  Blodgett contends that Guaranty should not be

5   able to retain the benefit of its unlawful conduct and should be required to transfer the policy

6   to him or pay him the full face value.

7        Citing to Arizona law, Defendants assert that Blodgett's claim for unjust enrichment

8   fails since it is undisputed that Blodgett was not "impoverished" as Guaranty paid the

9   premium for the BOLI policy.[8]  Further, Defendants claim that it is uncontroverted that

10  Blodgett is not entitled to the BOLI policy, as the BOLI policy never belonged to Blodgett,

11

12  _____

13  and the remaining tort claims under Wisconsin law.  Arizona choice-of-law rules apply in
    this case because a federal court sitting in diversity applies the choice-of-law rules of the

14  state in which it sits.  See Fields v. Legacy Health Sys., 413 F.3d 943, 950-51 (9th Cir. 2005).
    "Arizona courts apply the principles of the Restatement (Second) of Conflict of Laws (1971)

15  ["Restatement of Conflicts"] to determine the controlling law for multistate torts."  Bates v.
    Super. Ct., 749 P.2d 1367, 1369 (Ariz. 1988) (citation omitted).  Under the Restatement of

16  Conflicts, "courts are to resolve tort issues under the law of the state having the most
    significant relationship to both the occurrence and the parties with respect to any particular

17  question."  Id. at 1370.  If a tort claim involves interpretation of a contract between the
    parties, the choice-of-law provision in the contract applies.  See Winsor v. Glasswerks PHX,

18  L.L.C., 63 P.3d 1040, 1044 (Ariz. App. 2003) (citing Manetti-Farrow, Inc. v. Gucci Am.,
    Inc., 858 F.2d 509, 514 (9th Cir. 1988)); see also S. Union Co. v. Sw. Gas Corp., 165

19  F.Supp.2d 1010, 1028 (D. Ariz. 2001) (under Restatement of Conflicts § 201, contractual
    choice-of-law provision is applied to fraud claims, unless the choice-of-law provision itself

20  was obtained by misrepresentation).

21      [8]  Defendants' Motion for Summary Judgment on Plaintiffs' Claims argues that

22  Arizona law applies to each of Blodgett's tort claims, and Plaintiffs' Response to
    Defendants' Motion for Summary Judgment on Plaintiffs' Claims analyzes each of

23  Blodgett's tort claims in detail under Arizona law.  Although the Court has determined that
    Wisconsin law applies to Blodgett's BOLI claims, it is apparent that whether Wisconsin or

24  Arizona law applies is not dispositive of the issues.  Indeed, in his Reply in support of his
    Motion for Partial Summary Judgment, Blodgett even concedes that "[t]here is no real

25  substantive difference [] between Arizona and Wisconsin law with respect to Blodgett's
    BOLI Claims."  Blodgett states that "[w]hether Arizona or Wisconsin law applies, Blodgett

26  is entitled to summary judgment on each of [the] BOLI Claims."

27

28

and neither he nor his beneficiaries are entitled to any death benefit as Blodgett is no longer an employee of the Defendants.

"[A]n action for recovery based upon unjust enrichment is grounded on the moral principle that one who has received a benefit has a duty to make restitution where retaining such a benefit would be unjust." Watts v. Watts, 405 N.W.2d 303, 313 (Wis. 1987). "[A] claim of unjust enrichment does not arise out of an agreement entered into by the parties." Id.

A plaintiff must allege and prove three elements to prevail on an unjust enrichment claim: "'(1) a benefit conferred upon the defendant by the plaintiff, (2) appreciation by the defendant of the fact of such benefit, and (3) acceptance and retention by the defendant of the benefit, under circumstances such that it would be inequitable to retain the benefit without payment of the value thereof.'" Seegers v. Sprague, 236 N.W.2d 227, 230 (Wis. 1975) (quoting Don Ganser & Assocs., Inc. v. MHI, Inc., 142 N.W.2d 781, 783 (Wis. 1966).

Initially, the Court notes that the parties elected to enter into the Preferred Death Benefit Agreement and to be bound by the terms of said Agreement. The Agreement stated that Guaranty "shall at all times be the owner of the policy" and "shall have the right to designate the beneficiary thereunder," and set forth that Guaranty was purchasing a life insurance policy on Blodgett's life. The Agreement further provided that the preferred death benefit would terminate on the date that Blodgett's employment with Shelter was terminated. Thus, Blodgett had full knowledge of the fact that Guaranty was taking out a life insurance policy on his life, he consented to the application for that policy, and he received a significant benefit from that policy – as long as he was employed by Guaranty. Under Wisconsin law, unjust enrichment is an obligation enforced in the absence of any agreement. See Beer Capitol Distrib., Inc. v. Guinness Bass Import Co., 290 F.3d 877, 881 (7th Cir. 2002) ("unjust enrichment is an obligation enforced in the absence of any agreement"). Having agreed to the specific terms of an agreement, a party cannot seek to improve its position by appealing to equity when, as a result of subsequent events, it appears that the other party to the agreement benefitted more than either may have expected.

1    Moreover, the Court finds that Blodgett's unjust enrichment claim also fails because

2    he cannot show that he conferred a benefit upon Guaranty that it would be unjust for it to

3    retain.  There is no dispute that Guaranty gained a benefit by taking out the BOLI policy on

4    Blodgett's life.  As previously discussed, however, Guaranty had the power to obtain such

5    insurance on Blodgett as branch manager and vice president of Shelter.  See 56 A.L.R.3d

6    1086 (cases cited therein).  There was nothing "inequitable" in Guaranty's acceptance and

7    retention of such a benefit.  And, since the Court has found that (1) Guaranty had an

8    insurable interest on Blodgett's life, (2) Blodgett consented to the issuance of the BOLI

9    policy, and (3) Guaranty did not violate the Wis. Stat. § 631.07, Blodgett's citations to

10   Richard v. Wal-Mart Stores, Inc., 559 F.3d 341, 346 (5th Cir. 2009), John A. Artukovich &

11   Sons, Inc. v. Reliance Truck Co., 614 P.2d 327, 329 (Ariz. 1980), and Restatement of

12   Restitution § 44, are inapplicable and not persuasive.

13   Thus, the Court finds that Blodgett has failed to establish the requisite elements for

14   an unjust enrichment claim, and summary judgment is appropriately granted to Defendants

15   on Count Nine.

16   **3.    Constructive Trust (Count Ten)**

17   Blodgett argues that "[t]he constructive trust remedy is available under both Arizona

18   law and Wisconsin law."  Specifically, citing to Burch & Cracchiolo, P.A. v. Pugilani, 697

19   P.2d 674 (Ariz. 1985), Blodgett contends that a constructive trust is an appropriate remedy

20   in this case as the dispute involves a specific piece of property that the legal owner obtained

21   wrongfully.  Blodgett also states that Wis. Stat. § 631.07 provides for a constructive trust

22   when a policy is obtained without the written consent of the insured.  Lastly, Blodgett cites

23   Mayo v. Hartford Life Ins. Co., 354 F.3d 400, 409 n.10 (5th Cir. 2004) and Torrez v. Winn-

24   Dixie Stores, Inc., 118 S.W.3d 817, 820 (Tex. App. 2003) arguing that the imposition of a

25   constructive trust over the proceeds of the BOLI policy is appropriate as "the necessary

26   insurable interest is lacking."

27

28

1    Defendants claim that "[u]nder the undisputed facts and circumstances of this case,
2    because neither Blodgett nor his beneficiaries have any present right to, or interest in, the
3    BOLI policy, there is no basis for a constructive trust."

4    A constructive trust is "an equitable device created by law to prevent unjust
5    enrichment, which arises when one party receives a benefit, the retention of which is unjust
6    to another." Wilharms v. Wilharms, 287 N.W.2d 779, 783 (Wis. 1980). In order to impose
7    a constructive trust on property "the legal title must be held by someone who in equity and
8    good conscience should not be entitled to beneficial enjoyment." Id. In addition, title must
9    have been obtained "by means of actual or constructive fraud, duress, abuse of a confidential
10   relationship, mistake, commission of a wrong, or by any form of unconscionable conduct."
11   Id.

12   The cases Blodgett cites in support of his argument are misplaced, and Blodgett has
13   failed to demonstrate that the BOLI policy was "obtained wrongfully" or that the "policy
14   [was] obtained without the written consent of the insured." Again, this Court has already
15   found that: Guaranty had an insurable interest on Blodgett's life; Guaranty had the power to
16   obtain the BOLI policy on Blodgett's life; Blodgett consented to the issuance of the BOLI
17   policy; and Guaranty did not violate Wis. Stat. § 631.07. Blodgett received the preferred
18   death benefit due to his status as an employee of Shelter. Blodgett terminated his
19   employment with Shelter, therefore, any death benefit ended when Blodgett ended his
20   employment. Under the circumstances of this case, Blodgett has failed to establish the
21   requisite elements for imposition of a constructive trust. The Court will grant Defendants'
22   Motion for Summary Judgment and deny Blodgett's Motion for Partial Summary Judgment
23   as to Count Ten.

24   **4.    Misappropriation of Name and Identity (Count Two)**

25   In support of his claim for Misappropriation of Name and Identity, Blodgett cites
26   Lemon v. Harlem Globetrotters Int'l, Inc., 437 F.Supp.2d 1089, 1100 (D. Ariz. 2006) and
27   Pooley v. Nat'l Hole-In-One Ass'n, 89 F.Supp.2d 1108, 1111-12 (D. Ariz. 2000), and states
28   that, construed as a right of publicity claim, Guaranty used Blodgett's personal information

1    without his knowledge or consent in order to gain a financial benefit for itself, thereby

2    infringing on Blodgett's privacy rights.  Blodgett also contends that Wisconsin recognizes

3    the right of publicity tort by statute, Wis. Stat. § 995.50(2)(b), and argues that Guaranty did

4    not have Blodgett's written consent to use his name and personal information for business

5    purposes and therefore violated Wisconsin's statute.

6          Citing Meadows v. Hartford Life Ins. Co., 492 F.3d 634 (5th Cir. 2007), Defendants

7    claim that Blodgett has failed to state a cognizable claim for misappropriation of name and

8    identity since Blodgett's name and identity have no appreciable notoriety, skill, or goodwill

9    in the commercial market.  Moreover, Defendants state that Blodgett has not alleged that the

10   BOLI policy purchased by Guaranty prevented him from obtaining life insurance, or in any

11   way reduced the value of his identity.

12         Wisconsin recognizes a right of publicity under both statutory and common law.  See

13   Hirsch v. S.C. Johnson & Son, Inc., 280 N.W.2d 129, 138 (Wis. 1979).  Wisconsin's privacy

14   statute, § 995.50(2)(b), prohibits the "use, for advertising purposes or for purposes of trade,

15   of the name, portrait or picture of any living person, without having first obtained the written

16   consent of the person."  Similarly, the common law tort of misappropriation protects the

17   "property interest in the publicity value" of one's identity (name, portrait or picture) from

18   commercial exploitation by others.  See Hirsch, 280 N.W.2d at 132.

19         Notably, Wisconsin has distinguished itself from the Restatement by limiting the tort

20   to commercial purposes, adding "for advertising purpose or for purposes of trade."  Having

21   reviewed the record, Blodgett has failed to demonstrate, much less allege sufficient facts in

22   his Amended Complaint, that Guaranty used his name for advertising or trade purposes.  See

23   Stayart v. Google, Inc., 783 F.Supp.2d 1055, 1057 (E.D. Wis. 2011) (finding that plaintiff

24   failed to allege facts sufficient to plausibly infer that defendant used her name for advertising

25   or trade purposes, as required to state a claim pursuant to Wis. Stat. § 995.50(2)(b) and

26   Wisconsin common law).  Thus, Blodgett's attempt to fashion a claim for misappropriation

27   of name and identity under the circumstances of this case, which does not involve advertising

28   or trade purposes, must fail.

1    In any event, this Court has already found that by signing the Preferred Death Benefit

2    Agreement and Underwriting Questionnaire provided by Northwestern Mutual Life, Blodgett

3    consented to the "application for life insurance in accordance with the terms of the

4    employer's Life Insurance Program" and, therefore, Guaranty had Blodgett's written consent

5    to use his name and personal information.  The Court will grant Defendants' Motion for

6    Summary Judgment and deny Blodgett's Motion for Partial Summary Judgment as to Count

7    Two.

8         **5.     Conversion (Count Four)**

9         In his Response to Defendants' Motion for Summary Judgment, Blodgett argues that

10   by violating Wisconsin's statutory written consent requirement through a purposeful

11   misrepresentation, Guaranty violated the law and therefore is holding property that rightfully

12   belongs to him.  Citing Mobile Discount Corp. v. Schumacher, 676 P.2d 649 (Ariz. App.

13   1983), Blodgett alleges that when he completed the paperwork allowing Guaranty to obtain

14   the policy, he did so based on the understanding that "the policy was a benefit for him and

15   him alone."  He claims that Guaranty hid the fact that it was obtaining an interest in

16   Blodgett's death and that it stood to gain a substantial sum, which was possible only because

17   he completed the paperwork under a mis-impression created by Guaranty.  Blodgett states

18   that he has a right to control the policy.

19        Defendants assert that Blodgett cannot state a claim for conversion of the BOLI

20   policy, as he never owned the policy nor had the right to use or control the policy or its

21   proceeds.  Further, Defendants contend that any rights Blodgett's beneficiaries had to any

22   death benefit terminated at the time Blodgett terminated his employment with Shelter.  Thus,

23   Defendants claim that Blodgett never had, nor presently has, any ownership rights in, or right

24   to control, the BOLI policy.

25        Pursuant to Wisconsin law, "[c]onversion is often defined as the wrongful exercise

26   of dominion or control over a chattel."  Production Credit Ass'n of Madison v. Nowatski,

27   280 N.W.2d 118, 123 (Wis. 1979).  "The elements of conversion are: (1) intentional control

28   or taking of property belonging to another, (2) without the owner's consent, (3) resulting in

1    serious interference with the rights of the owner to possess the property." H.A. Friend & Co.

2    v. Professional Stationery, Inc., 720 N.W.2d 96, 100 (Wis. App. 2006).   However,

3    "conversion does not include wrongful intent or knowledge that what is being taken

4    rightfully belongs to another." Bruner v. Heritage Companies, 593 N.W.2d 814, 818 (Wis.

5    App. 1999).

6         The Court finds Blodgett's attempt to analogize this case to Mobile Discount Corp.

7    v. Schumacher, unpersuasive.  In Mobile Discount, the Schumachers bought a mobile home

8    and were required to make payments.   See 676 P.2d at 651-52.   Mobile Discount was

9    assigned the right to receive the payments and, in turn, assigned those rights to Mission

10   Bank.   See id.   As part of the assignment, Mobile Discount agreed to guaranty the

11   Schumachers' obligation to pay. See id.  When the Schumachers decided that they could no

12   longer make the payments, they contacted the seller, who told them that they could return the

13   mobile home. See id.  The Schumachers understood from their conversation with the seller

14   that they would no longer have to make payments if they returned the mobile home.  See id.

15   Mobile Discount picked up the mobile home, continued making payments to the bank, and

16   then sued the Schumachers to recover the payments made under the guaranty. See id.  The

17   Schumachers counterclaimed alleging conversion of the mobile home. See id.  The Arizona

18   Court of Appeals held that the trial court did not err in finding Mobile Discount liable for

19   conversion because "its continued possession [of the mobile home] was without valid

20   consent."

21        Here, despite Blodgett's alleged understanding that "the policy was a benefit for him

22   and him alone," Blodgett completed and signed the Preferred Death Benefit Agreement and

23   the Employer Sponsored Underwriting Questionnaire, thereby consenting to the issuance of

24   the BOLI policy in accordance with Wis. Stat. § 631.07.  The Agreement stated that

25   Guaranty "shall at all times be the owner of the policy" and "shall have the right to designate

26   the beneficiary thereunder," and set forth that Guaranty was purchasing a life insurance

27   policy on Blodgett's life.  The Agreement further provided that Guaranty, at its option, had

28   the right to cancel the BOLI policy, increase coverage, decrease coverage, or take any other

action with respect to the BOLI policy. The Agreement stated that the preferred death benefit would terminate on the date that Blodgett's employment with Shelter terminated. Accordingly, Blodgett cannot state a claim for conversion of the BOLI policy, as Blodgett never owned the policy nor had the right to use or control the policy or its proceeds.

Under these circumstances, the Court will grant Defendants' Motion for Summary Judgment and deny Blodgett's Motion for Partial Summary Judgment as to Count Four.

### 6. Fraudulent Misrepresentation (Count Five) and Negligent Misrepresentation (Count Six)

Blodgett argues that the materials Guaranty sent to him on December 3, 1999, contain a fraudulent misrepresentation. Specifically, Blodgett asserts that Guaranty told him that he was required to complete paperwork in order to obtain a preferred death benefit for himself, and that the true purpose of the paperwork was to allow Guaranty to obtain a substantial benefit for itself, which was never disclosed. Blodgett contends that Guaranty had a duty to disclose its intent to obtain a benefit for itself based on the language set forth in Wis. Stat. § 631.07, which explicitly requires a person's written consent before another may insure his life. Based on these same facts, and in support of his claim for negligent misrepresentation, Blodgett alleges that Guaranty was at least negligent in supplying false information – or, in this case, failing to disclose information.

Defendants argue that Blodgett fails to establish the elements of fraudulent or negligent misrepresentation. Defendants state that Blodgett has failed to identify any false statement made by Guaranty or establish that Guaranty had a duty to inform him that it was also a beneficiary of the BOLI policy. Defendants additionally allege that Blodgett has failed to show that he relied upon a misrepresentation to his "pecuniary damage."

Claims of fraudulent or intentional misrepresentation and negligent misrepresentation share the following elements: (1) the defendant must have made a representation of fact to the plaintiff; (2) the representation of fact must be false; and (3) the plaintiff must have believed and relied on the misrepresentation to his detriment or damage. See Ollerman v. O'Rourke Co., Inc., 288 N.W.2d 95, 99 (Wis. 1980); see also Tietsworth v. Harley-Davidson, Inc., 677 N.W.2d 233, 239 (Wis. 2004). An intentional misrepresentation claim

1   carries the following additional elements:   (4) the defendant must have made the

2   misrepresentation with knowledge that it was false or recklessly without caring whether it

3   was true or false, and (5) the defendant must have made the misrepresentation with intent to

4   deceive and to induce the plaintiff to act on it to his detriment or damage.  See Tietsworth,

5   677 N.W.2d at 239.  And, negligent misrepresentation adds the following: the defendant need

6   only fail to exercise ordinary care in making a misrepresentation or in ascertaining the facts

7   but like other cases of negligence, it requires a duty of care or a voluntary assumption of a

8   duty.  See Ollerman, 288 N.W.2d at 99.

9        An intentional misrepresentation claim may arise either from a "failure to disclose a

10   material fact" or from a "statement of a material fact which is untrue."  See Ramsden v. Farm

11   Credit Services of North Central Wisconsin ACA, 590 N.W.2d 1, 5 (Wis. App. 1998).  Here,

12   Blodgett's intentional misrepresentation claim is based on the failure to disclose a material

13   fact.  "The general rule is that silence, a failure to disclose a fact, is not an intentional

14   misrepresentation unless the [defendant] has a duty to disclose."  Ollerman, 288 N.W.2d at

15   99-100.  "If there is a duty to disclose a fact, failure to disclose that fact is treated in the law

16   as equivalent to a representation of the nonexistence of the fact."  Id. at 100.

17        Of particular significance in this case, negligent misrepresentation by nondisclosure

18   has not been recognized as a tort in Wisconsin.  See Kaloti Enterprises, Inc. v. Kellogg Sales

19   Co., 699 N.W.2d 205, 211-12 ("We have never held that a claim for strict responsibility for

20   misrepresentation or negligent misrepresentation can arise from failure to disclose.").

21   Indeed, finding that "the foundational and oft-cited case of [Ollerman] specifically declined

22   to adopt a negligent misrepresentation-by-nondisclosure claim" and that "Ollerman's

23   endorsement of a limited species of liability for nondisclosure pertained to the tort of

24   intentional misrepresentation," the United States Court of Appeals for the Seventh Circuit

25   stated that "[n]egligent misrepresentation by nondisclosure is a claim of questionable heritage

26   and has been soundly rejected in some jurisdictions."  Eberts v. Goderstad, 569 F.3d 757,

27   765-66 (7th Cir. 2009).  In any event, the Court will address whether Guaranty has made any

28

false statement or had a duty to inform Blodgett that it was also a beneficiary of the BOLI policy.

The record demonstrates the following facts: (1) Guaranty informed Blodgett that the preferred death benefit was being offered to certain qualified, full time vice presidents and above; (2) the Preferred Death Benefit Agreement informed Blodgett that Guaranty was purchasing a life insurance policy on Blodgett's life, and that Guaranty was at all times the owner of the BOLI policy, and had the right to designate the beneficiary thereunder; (3) the Agreement also informed Blodgett that Guaranty had the right to cancel the BOLI policy, increase or decrease coverage, or take any other action with respect to the BOLI policy; (4) the Agreement informed Blodgett that the maximum amount of his preferred death benefit was $500,000; and (5) the preferred death benefit was being offered at no cost to the employees, and Blodgett paid nothing for the BOLI policy. None of the foregoing statements were false.

Further, to the extent that Blodgett attempts to claim that Guaranty misrepresented the amount of Blodgett's death benefit by stating that the Preferred Death Benefit Agreement had a form attached to it "explicitly stating that the face amount of the policy would be three times salary capped at $500,000," the Court finds that the Agreement states otherwise. The attachment to the Agreement identified the maximum amount of the "preferred death benefit" (up to three times average annual compensation with a maximum benefit of $500,000). This attachment did not state the "face amount" of the life insurance policy, but rather the amount of the "preferred death benefit" that would be paid to the beneficiary that he named – which was an accurate representation.

Blodgett, however, argues that in light of statutory requirement of written consent set forth in Wis. Stat. § 631.07, Guaranty had a duty to disclose that it was also a beneficiary of the BOLI policy. First, the Court has already found that Guaranty had an insurable interest on Blodgett's life, Blodgett consented to the issuance of the policy, and Guaranty did not violate Wis. Stat. § 631.07. Second, other than Blodgett's brief mention of the Wisconsin statue at issue, his pleadings are completely devoid of any legal authority or argument

1   supporting his conclusion that Guaranty had a specific duty to inform Blodgett that it was
2   also a beneficiary of the BOLI policy.

3        In any event, to the extent any duty existed, the Court finds that the Preferred Death
4   Benefit Agreement informed Blodgett that Guaranty owned the BOLI policy, had the right
5   to designate the beneficiary, and, as noted earlier in this decision, did not contain any
6   provision indicating that the BOLI policy itself would terminate in the event that Blodgett's
7   employment with Guaranty terminated (or Guaranty as beneficiary no longer had an
8   insurable interest in Blodgett's life).  Therefore, at a minimum, according to the materials
9   provided to Blodgett, Blodgett presumably knew (or, at a minimum, was on notice) that when
10  he was no longer an employee of Guaranty, Guaranty would have the right to designate itself
11  as the beneficiary for any amounts payable under the policy.

12       Accordingly, finding that Blodgett has failed satisfy the requisite elements of his
13  fraudulent and negligent misrepresentation claims, the Court will grant Defendants' Motion
14  for Summary Judgment and deny Blodgett's Motion for Partial Summary Judgment as to
15  Counts Five and Six.

16  **B.    Plaintiffs' Breach of Contract Claims**

17       Counts One and Three of the Amended Complaint contain breach of contract claims,
18  wherein Plaintiffs allege that "Defendants Shelter Mortgage and Guaranty Bank materially
19  and substantially breached the loan origination agreement by unilaterally making the decision
20  to cease any new construction lending in Arizona, ordering that the line of construction
21  lending to be reduced dramatically, and taking all decision making regarding Arizona branch
22  loans onto themselves."  Plaintiffs also allege that Defendants "breached their contract duties
23  of good faith and fair dealing."

24       In their Motion for Summary Judgment, Defendants argue that there is no provision
25  in the Loan Origination Agreement requiring Shelter to make construction loans.  Defendants
26  state that although Shelter and Guaranty did originate and fund construction loans in Arizona,
27  for which Blodgett and Starboard were compensated through the Compensation and
28  Origination Agreements, Defendants were not contractually obligated to do so.  Further,

1    Defendants contend that there is nothing in the Compensation or Origination Agreements
2    giving Blodgett or Starboard the authority to make decisions regarding Arizona Branch loans.
3    To the contrary, Blodgett and Starboard were at all times required to follow the policies and
4    procedures of Defendants.

5        In further support of their argument, Defendants claim that they also had the right to
6    exercise their authority over the loan approval process, given the nature of the Arizona
7    market and the strictures of the oversight by the Office of Thrift Supervision of the
8    Department of Treasury.  Defendants assert that although Blodgett may have been permitted
9    to act with some degree of autonomy as a manager in prior years, the market and the financial
10   conditions of Shelter and Guaranty had changed significantly, and under the circumstances,
11   Defendants were required to make business decisions in order to protect the viability of
12   Shelter and Guaranty.

13       Lastly, Defendants state that Blodgett's silence and continued receipt of millions of
14   dollars in income, in conjunction with his failure to assert a breach, constituted a waiver of
15   Plaintiffs' right to assert a claim for breach of contract nearly three years after Plaintiffs
16   allege the breach to have occurred.

17       In response, Plaintiffs argue that "[t]here are disputed issues of fact that preclude
18   summary judgment on the breach-of-joint-venture claims."  Plaintiffs state that the
19   Compensation and Origination Agreements collectively comprise a joint venture agreement
20   under which "Blodgett and Guaranty agreed to share profits and losses 50-50 and to share
21   decision-making authority."  Plaintiffs allege that Guaranty breached the joint venture
22   agreement when it undermined the purpose of the joint venture and destroyed the common
23   interest of the parties by making an affirmative decision to stop seeking profits.  In support
24   of their contention regarding a joint venture, Plaintiffs assert that Blodgett had control of the
25   day-to-day operational decisions for the Arizona Branch, had a "voice or right to be heard"
26   in the control and management of the venture, and had a personal relationship with Gerald
27   Levy, who made and changed some business decisions after talking with Blodgett.  Plaintiffs
28   contend that, beginning in November of 2007, Guaranty engaged in various efforts that

1  undermined the purpose of its joint venture with Blodgett.  Specifically, Plaintiffs argue that

2  Guaranty took decision-making authority away from Blodgett and stopped funding loans.

3          In order to state a claim for breach of contract, a plaintiff must allege the existence of

4  a contract between the plaintiff and defendant, a breach of the contract by the defendant, and

5  resulting damage to the plaintiff.  See Warren v. Sierra Pacific Mortg. Srvcs. Inc., 2011 WL

6  1526957, *3 (D. Ariz. April 22, 2011) (citing Chartone, Inc. v. Bernini, 83 P.3d 1103, 1111

7  (Ariz. App. 2004)); Graham v. Asbury, 540 P.2d 656, 657 (Ariz. 1975).[9]

8          The Court, having reviewed the Amended Complaint and Plaintiffs' Response to

9  Defendants' Motion, finds that Plaintiffs have failed to demonstrate – much less allege – a

10  breach of any express term in the Compensation or Origination Agreements.  Instead,

11  Plaintiffs appear to rely on the implied covenant of good faith and fair dealing and their

12  characterization of the Compensation and Origination Agreements as a joint venture

13  agreement in support of their breach of contract claims.

14          Arizona law implies a covenant of good faith and fair dealing in all contracts.  See

15  Rawlings v. Apodaca, 726 P.2d 565, 569 (Ariz. 1986).  The contractual relationship gives

16  rise to the duty, and the duty's essence "is that neither party will act to impair the right of the

17  other to receive the benefits which flow from their ... contractual relationship."  Id. (citations

18  omitted).  There are generally two ways a party can violate the covenant of good faith: either

19  (1) "by exercising express discretion in a way inconsistent with a party's reasonable

20  expectations," or (2) "by acting in ways not expressly excluded by the contract's terms but

21  which nevertheless bear adversely on the party's reasonably expected benefits of the

22  bargain."  Bike Fashion Corp. v. Kramer, 46 P.3d 431, 435 (Ariz. App. 2002) (citing Wells

23  Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust

24  Fund, 38 P.3d 12, 28 (Ariz. 2002)).

25

26          [9]  Both parties cite to Arizona law in support of their respective positions regarding
Plaintiffs' breach of contract claims, and do not allege any choice-of-law issue related to said
27  claims.  In any event, because the result of Defendants' Motion for Summary Judgment on
Plaintiffs' breach of contract claims will be the same under either Arizona or Wisconsin law,
28  the Court need not decide any alleged choice-of-law issue.

1    Additionally, under Arizona law, a joint venture is formed when two or more parties
2    agree to pursue a particular enterprise in the hope of sharing a profit.  See Arizona Public
3    Service Co. v. Lamb, 327 P.2d 998, 1000 (Ariz. 1958).  To establish a joint venture, there
4    must be: "(1) an agreement; (2) a common purpose; (3) a community of interest; (4) an equal
5    right of control; and (5) participation in profits and losses."  Estate of Hernandez v. Flavio,
6    930 P.2d 1309, 1312 (Ariz. 1997).  Where there is a question as to the existence or nature of
7    a joint venture, each case must be resolved upon its own facts.  See Mercer v. Vinson, 336
8    P.2d 854, 858 (Ariz. 1959).

9    The Court will first address Plaintiffs' assertion regarding the existence of a joint
10   venture.  Although Plaintiffs failed to plead the existence of a joint venture in their First
11   Amended Complaint, in an apparent attempt to establish certain legal rights and obligations
12   between the parties, Plaintiffs for the first time characterize the Compensation and
13   Origination Agreements as a joint venture agreement.  Plaintiffs argue that the parties had
14   a common interest in making profits, contributed capital, and agreed to share profits and
15   losses equally.  In addition, Plaintiffs claim that Blodgett had control of the day-to-day
16   operational decisions for the Arizona Branch, and broader policy decisions were vested in
17   Guaranty's Board of Directors, with Blodgett having a "voice and the right to be heard."

18   Under Arizona law, parties to a joint venture must have an equal right of control over
19   the venture.  See Estate of Hernandez, 930 P.2d at 1312.  In determining whether the parties
20   held an equal right of control, "[t]he test is whether there is a right of mutual control over the
21   subject matter of the venture, that is, the means by which the parties intend to obtain their
22   objective." Ellingson v. Sloan, 527 P.2d 1100, 1103-04 (Ariz. App. 1974).  "Either expressly
23   or impliedly, the agreement must indicate that 'each of the parties to such joint adventure has
24   authority to act for all in respect to the control of the means or agencies employed to execute
25   such common purpose.'"  Estate of Hernandez, 930 P.2d at 1312 (citing West v. Soto, 336
26   P.2d 153, 157 (Ariz. 1959)).  Each party to the joint venture must have an "equal right to
27   direct and govern the movements and conduct of each other with respect thereto.  Each must
28

1   have some voice and right to be heard in its control or management." Estate of Hernandez,

2   930 P.2d at1312 (citing Maloy v. Taylor, 346 P.2d 1086, 1088 (Ariz. 1959)).

3          Pursuant to the terms of the Compensation and Origination Agreements, the Court

4   finds that the parties did not hold the requisite equal right of control, thus indicating that

5   there was no joint venture.  Nothing in either the Compensation or Origination Agreement

6   mentions "joint venture" or specifies an intent to create a joint venture.  Rather, the terms of

7   the Agreements more appropriately exemplify an employer-employee relationship – a

8   relationship inconsistent with a joint venture.  For instance, the Compensation Agreement

9   provides that Blodgett "shall receive a base salary of $75,000/year for his services as

10  Manager of Employer's Arizona retail mortgage lending operations ... ."  The Agreement

11  states that "Employer and a licensed mortgage broker or lender entity owned and controlled

12  by Blodgett ('Originator') shall also enter the Loan Origination Agreement ... . Except for

13  any provisions which expressly survive the termination thereof, the Origination Agreement

14  shall continue to remain in effect so long as Blodgett remains an employee of Employer."

15  Further, pursuant to the Compensation Agreement, as an employee of Defendants, Blodgett

16  would "be subject to all of Employer's policies and procedures, including, without limitation,

17  all human resources, accounting, compliance and data security policies."  In addition, the

18  Origination Agreement required that "any loan submitted shall be subject to the policies and

19  procedures of [Shelter] as exist on the date of submission."  Thus, nothing either expressly

20  or impliedly in the Agreements indicates that "each of the parties ... has authority to act for

21  all in respect to the control of the means or agencies employed to execute such common

22  purpose," or an "equal right to direct and govern the movements and conduct of each other

23  ... ."

24         Further, while Plaintiffs assert that Blodgett had control of the day-to-day operational

25  decisions for the Arizona Branch, had a "voice or right to be heard" in the control and

26  management of the venture, and had a personal relationship with Gerald Levy, who made and

27  changed some business decisions after talking with Blodgett, such is not inconsistent with

28  – and no doubt required of – the "Manager of Employer's Arizona retail mortgage lending

1   operations." And, Blodgett's conclusory, unsupported statements set forth in his deposition

2   testimony are not enough to establish or create a question of fact as to the existence of a joint

3   venture.[10]   A party opposing a motion for summary judgment cannot rest upon mere

4   allegations or denials in the pleadings or papers, but instead must set forth specific facts

5   demonstrating a genuine issue for trial.  See Anderson, 477 U.S. at 250.  Accordingly,

6   Plaintiffs have not sufficiently shown an equal right of control over any alleged joint venture

7   and, thus, have failed to establish the existence of a joint venture agreement by way of the

8   parties entering into the Compensation and Origination Agreements.

9       Plaintiffs' breach of contract claims fare no better relying on the implied covenant of

10  good faith and fair dealing. Again, in Arizona, the covenant of good faith and fair dealing is

11  implied in every contract, and the "duty arises by virtue of a contractual relationship."

12  Rawlings, 726 P.2d at 569.  "[B]ecause a party may be injured when the other party to a

13  contract manipulates bargaining power to its own advantage, a party may nevertheless breach

14  its duty of good faith without actually breaching an express covenant in the contract." Wells

15  Fargo Bank, 38 P.3d at 29 (citations omitted).  "[A]rizona law recognizes that a party can

16  breach the implied covenant of good faith and fair dealing both by exercising express

17

18      [10] In support of the existence of a joint venture, Blodgett submits the following
    testimony:

19      Q. You keep using the term "joint-venture relationship," and we've already
        established that that's nowhere to be found in this document. Did anybody

20      from Guaranty Bank or Shelter Mortgage ever tell you that they were entering
        into a joint venture with you?

21      A. Yes. ...

22      Q. Who told you that?

23      A. "Joint venture" and "partnership" are words that the bank uses
        interchangeably. And so in our discussions, it was never any question that it

24      was anything other than a joint-venture relationship.

25      Q. But did anyone from the bank in any email to you, in any conversation with
        you, or did Jill Belconis ... specifically use the words "joint venture" with you,

26      or are you just assuming because they may have used the words "partnership,"
        that's what they meant?

27      A. No, I'm assuming that. I'm saying the words were used interchangeably. ...

28      It was – the spirit of the agreement was crystal clear. It was a joint-venture
        relationship. It was a partnership.

1   discretion in a way inconsistent with a party's reasonable expectations and by acting in way
2   not expressly excluded by the contract's terms but which nevertheless bear adversely on the
3   party's reasonably expected benefits of the bargain."  Bike Fashion Corp., 46 P.3d at 435
4   (citing Wells Fargo Bank, 38 P.3d at 30).

5        In Southwest Sav. and Loan Ass'n v. SunAmp Sys., Inc., 838 P.2d 1314 (Ariz. App.
6   1992), the Arizona Court of Appeals clarified, however, that "the duty to act in good faith
7   does not alter the specific obligations of the parties under the contract. ... Acts in accord with
8   the terms of one's contract cannot *without more* be equated with bad faith."  Id. at 1319-20
9   (emphasis original) (citation omitted); see also Wells Fargo Bank, 38 P.3d at 30.  The court
10  stated, "[t]he good faith performance doctrine may be said to permit the exercise of discretion
11  for any purpose – including ordinary business purposes – reasonably within the
12  contemplation of the parties."  Id.  A contract thus would be breached by a failure to perform
13  in good faith if a party uses its discretion for a reason outside the contemplated range – a
14  reason beyond the risks assumed by the party claiming a breach.  See id.

15       Plaintiffs claim that Defendants "materially and substantially breached the loan
16  origination agreement by unilaterally making the decision to cease any new construction
17  lending in Arizona, ordering that the line of construction lending to be reduced dramatically,
18  and taking all decision making regarding Arizona branch loans onto themselves."  Plaintiffs
19  state that beginning in November of 2007, "Guaranty engaged in various efforts that
20  undermined the purpose of its joint venture with Blodgett."  Specifically, Plaintiffs allege that
21  "Guaranty took decision-making authority away from Blodgett to itself," and "stopped
22  funding loans and told Blodgett to cut the joint venture's loan portfolio in half."  Plaintiffs
23  contend that "Guaranty even refused to fund loans backed by collateral and creditworthy
24  borrowers," and "also tried to increase the cost of funds to the joint venture several times,
25  and reneged on an agreement with Blodgett to lower the cost of funds, efforts designed to
26  shift profits away from Blodgett into its own dwindling coffers."

27       The Court has already found that, pursuant to the terms set forth in the Compensation
28  and Origination Agreements, Blodgett (and Starboard), as Manager of Guaranty's Arizona

1   Branch, was required to follow the policies and procedures of Defendants – who retained

2   discretion regarding, *inter alia*, lending programs/procedures and other related business

3   decisions.  Nevertheless, such discretion would not be unfettered, but would be constrained

4   by Defendants' obligation to exercise its discretion in good faith.  See id. at 1320.  Thus,

5   "[t]he question is whether the jury might reasonably have found that [Defendants] wrongfully

6   exercised" their power as to their lending practices and decision making procedures at the

7   Arizona Branch "for a reason beyond the risks" that Plaintiffs assumed in the Agreements

8   with Defendants, "or for a reason inconsistent with [Plaintiffs'] 'justified expectations.'" Id.

9   (citations omitted).

10      Plaintiffs' breach of contract claims arise during a time frame commonly referred to

11  as the "Great Recession" – a period of marked global economic decline beginning in

12  December of 2007.[11]  In support of their Motion for Summary Judgment, Defendants allege

13  _____

14      [11]   The events surrounding the Great Recession and the downturn of the United States

15  housing market have been well documented. Indeed, as summarized by the United States
    District Court for the Southern District of New York:

16

17      The early years of this decade saw a boom in home financing which was
        fueled, among other things, by low interest rates and lax credit conditions.

18      New lending instruments, such as subprime mortgages (high credit risk loans)
        and Alt-A mortgages (low-documentation loans) kept the boom going.

19      Borrowers played a role too; they took on unmanageable risks on the
        assumption that the market would continue to rise and that refinancing options

20      would always be available in the future. Lending discipline was lacking in the
        system. Mortgage originators did not hold these high-risk mortgage loans.

21      Rather than carry the rising risk on their books, the originators sold their loans

22      into the secondary mortgage market, often as securitized packages known as
        mortgage-backed   securities   ("MBSs").   MBS   markets   grew   almost

23      exponentially.

24
        But then the housing bubble burst. In 2006, the demand for housing dropped

25      abruptly and home prices began to fall. In light of the changing housing
        market, banks modified their lending practices and became unwilling to

26      refinance home mortgages ... Subprime and Alt-A mortgage borrowers were
        unable to meet their loan obligations and the value of subprime and Alt-A

27      MBSs dropped precipitously. Given the ubiquity and proliferation of MBSs,
        the economy began to totter, and by 2008 was near collapse. Litigation erupted

28

that, in light of conditions brought on by the Great Recession, they were required to make business decisions in order to protect the viability of Shelter and Guaranty. Defendants contend that these decisions were not made in bad faith, nor were they directed solely at Blodgett.

Although the Arizona lending and real estate markets were solid at the time the parties entered into the Compensation and Origination Agreements, Defendants state that "those markets quickly went south in the ensuing years." Defendants document the economic downturn as follows:

> Starting in late 2007, the Greater Phoenix area underperformed the U.S. economy as a whole. In August of 2007, job losses began occurring, and a 3 year decline in real estate prices began in Arizona. By mid-2008, the housing market in the Metro Phoenix was in free-fall, with home values declining, and investors largely stopping buying as well. From late 2007 through 2010, improved residential lots were being sold for prices below replacement costs. According to the FDIC, Arizona banks began to reduce their involvement in construction and land development loans, beginning as early as 2008 and continuing through 2011. Banks also reduced their activity of jumbo mortgage loan originations due to a combination of defaults, declines in originations, and payoffs. From 1990 to 2005, jumbo loan originations comprised approximately 23% of total loan originations. Beginning in 2008, jumbo loan originations fell to less than 10% of total loan originations and remained below 10% from 2008 through the second quarter of 2011.

Plaintiffs do not dispute the negative effect of the "Great Recession" on Defendants stating that "Guaranty's fortunes changed for the worse under the leadership of Douglas Levy ... . The bank's situation worsened after [the] Great Recession struck."

In addition, Defendants cite to "other outside forces" affecting Guaranty's decision-making during this time period. Defendants refer specifically to a cease-and-desist order issued against Guaranty by the Office of Thrift Supervision in March of 2009, which stated, the "Association and its directors, officers, and employees shall cease-and-desist from any unsafe and unsound practices addressed in the OTS Report of Examination dated July 7, 2008 of the Association (ROE), that precipitated the diminished capital levels, poor earnings, high level of classified assets, and inadequate policies and procedures." According to

---

immediately...."

In re Fannie Mae 2008 Securities Litigation, 742 F.Supp.2d 382, 391 (S.D.N.Y. 2010).

1    Guaranty, the cease-and-desist order extended to all Shelter branches, and mandated that
2    Guaranty stop home equity lending and obtain approval for anything that fell outside the
3    normal course of business.  Defendants argue that spending limitations were imposed and
4    they were forced to shut down jumbo loans, particularly in states where real estate values
5    were declining, such as Florida, Arizona, Nevada, and California.

6         The Court notes preliminarily that Plaintiffs do not argue that Defendants acted out
7    of spite, ill will, or any other non-business purpose.  Rather, Plaintiffs claim that the
8    "business judgment rule" and "good faith" are not defenses to breach of contract.  Plaintiffs
9    state that "[a]lthough Guaranty may have had reasons to stop funding loans for the Arizona
10   joint venture, it nevertheless breached its agreement and is liable for the breach."  The Court
11   finds Plaintiffs' contentions unpersuasive and contrary to the line of Arizona cases cited
12   herein.  See, e.g., SunAmp Sys., Inc., 838 P.2d at 1319-20.

13        The record shows that the exercise of Defendants' retained power as to its lending
14   practices and decision making procedures at its Arizona Branch was undisputedly financial
15   and related to their business purposes – nothing more.  Given the totality of the
16   circumstances, Shelter and Guaranty had every right to exercise their discretion and restrict
17   construction lending in Arizona.  They also had the right to exercise their authority over the
18   loan approval process, given the nature of the Arizona market and the strictures of the
19   oversight by the OTS.  Thus, the Court finds that Defendants exercised powers that they had
20   preserved at contract formation, and Plaintiffs had no justifiable expectation that a reasonable
21   bank and lender would act any differently.

22        Accordingly, the Court having found that Plaintiffs have failed demonstrate facts from
23   which a jury could find that Defendants wrongfully exercised their rights under the
24   Compensation and Origination Agreements or for a reason inconsistent with Plaintiffs'
25   justified expectations, will grant Defendants' Motion for Summary Judgment as to Plaintiffs'
26   breach of contract claims.

27                                    **CONCLUSION**

28

1     **IT IS THEREFORE ORDERED** that Plaintiff Mark Blodgett's Motion for Partial

2 Summary Judgment (Doc. 100) is **DENIED**;

3     **IT IS FURTHER ORDERED** that Defendant Shelter Mortgage Company, LLC, and

4 Guaranty Bank, F.S.B.'s Motion for Summary Judgment on Plaintiffs' Claims (Doc. 104) is

5 **GRANTED**;

6     **IT IS FURTHER ORDERED** that Plaintiffs' Motion to Strike Reply Statement of

7 Facts (Doc. 134) is **DENIED** as moot;

8     **IT IS FURTHER ORDERED** that in light of the Court's ruling, all remaining

9 deadlines set forth in this case are hereby **VACATED**; the Court will conduct a status

10 conference on **March 6, 2013 at 9:30 a.m., in courtroom 303** to discuss the status of the

11 Counterclaims set forth in Defendants' Answer to Plaintiffs' original Complaint, including

12 setting final trial and pretrial dates as to said Counterclaims, if applicable.

13     DATED this 8th day of February, 2013.

14

15

16                  Michelle H. Burns
                 United States Magistrate Judge

17

18

19

20

21

22

23

24

25

26

27

28